THE CARBONERO.

(Circuit Court of Appeals, First Circuit. January 9, 1901.)

No. 336.

1. TOWAGE—LOSS OF TOW—LIABILITY OF TUG.

The Carbonero, a powerful ocean tug, went to sea from Vineyard Haven, in heavy southwest weather, with three barges in tow; two of the barges being the St. Nicholas and the Excelsior. Although, after sailing, the weather became heavier, the tug did not put back, and finally was compelled to proceed with its tow to an intermediate anchorage. The St. Nicholas and Excelsior dragged their anchors and were finally lost. *Held*, in a suit by the owners of the barges against the tug, that the evidence as to the state of the weather was insufficient to sustain the charge that the tug was in fault either for going to sea, for not returning to port, or for anchoring where she did; also, that as to the St. Nicholas the tug rendered all the assistance which was possible, and was not in fault.

2. SAME—DUTY OF TUG—BURDEN OF PROOF.

Unless under extraordinary circumstances, it is the duty of a tug which has been compelled by stress of weather to anchor with her tow to promptly render all practicable assistance to a tow which is in peril; and where a barge, constituting a part of a tow anchored under such circumstances, dragged her anchor and began to drift, and the tug, on attempting to weigh anchor, found that her donkey engine would not work, a delay of 2½ hours, and until after the barge had drifted out of sight, before slipping her cable to go to the assistance of the tow, was a breach of the contract of towage, and also gross negligence; but, such negligence not

being a statutory fault, the burden does not rest upon the tug of proving that she could not have rescued the barge by diligent action, and to charge her with liability for the loss of the barge it must be shown by libelant, in accordance with the usual course in admiralty, that such loss was in fact due to her fault.

3. ADMIRALTY—APPEAL—INSUFFICIENCY OF EVIDENCE.

In a suit to charge a tug with liability for the loss of a tow, the evidence was such as to establish gross fault on the part of the tug, and to create a strong presumption against her; but upon the issue whether the loss was due to such fault neither party produced evidence which it was apparently within its power to produce, and without which the court on appeal was left to mere conjecture as to material facts, and unable to reach a satisfactory decision. *Held*, that the case would be remanded to the district court for further proofs, and if none were offered the libel should be dismissed.

Appeal from the District Court of the United States for the District of Massachusetts.

In Admiralty. Libels by the Reading Company and Melville L. Cobb against the steam tug Carbonero. From a judgment dismissing the libels, libelants appeal. Reversed.

The following is the opinion of the district court (LOWELL, District Judge):

"These were libels filed against the tug Carbonero for damage suffered on February 16, 1898, by the Excelsior and St. Nicholas, two barges of its tow, and by their cargoes. At about 7:40 a. m. the tug, with the two barges mentioned and the barge Indian Ridge, started to the eastward from Vineyard Haven. The wind was between west and southwest, blowing about 15 miles an hour. The sky was overcast, but the sun occasionally broke through. When they were off Cape Poge it began to snow, at first in flurries, then in a severe snowstorm, the wind increasing fast. After passing Half Moon Buoy, the tug headed between north and northeast, and proceeded on that course for about an hour and a half, then hauled the barges into the wind, and anchored them about 1 p. m., anchoring itself opposite the middle barge. At about 2:20 the Excelsior parted its chain cable. The tug tried to get up its own anchor, its donkey engine broke, an attempt was made to repair the engine, and the tug did not get clear by slipping its anchor until about 5 p. m. The Excelsior had then been long out of sight, and was totally lost, with all hands aboard. At about 5 o'clock the St. Nicholas parted its chain, the tug rescued the crew, but the barge went ashore on the Common Flats, and was somewhat injured. The faults charged against the tug are:

"(1) Departure from Vineyard Haven in dangerous weather. I think the libelant's case is not made out upon this point. The storm signals, which were seen or might have been seen by the Carbonero's captain in spite of his statement to the contrary, were southeast storm signals, and manifestly the southeast storm, which, during the night, had reached the verifiable minimum for only 10 minutes, was then over. Strong winds from a westerly direction were to be expected, but not, I think, any considerable quantity of snow. There was nothing in the wind, when it came, to prevent the tug and tow from reaching a safe anchorage off Chatham. It was the blinding snowstorm which made unsafe the navigation around Monomoy and Pollock Rip. Upon the whole, I think that, at the time of starting, the conditions were not so unfavorable as to make starting negligent. Something must be allowed to the discretion of the captain of the tug. The captains of the St. Nicholas and of the Indian Ridge testified that they did not think it prudent to leave Vineyard Haven on the morning of February 16th. At the trial I thought this testimony inadmissible, but I now think otherwise. Transportation Line v. Hope, 95 U. S. 297, 24 L. Ed. 477. Considering the relations of

the parties, however, the testimony is not of great weight, and it is to be noted that neither captain made any objection to the departure, and both apparently expected it. That the captain of the Indian Ridge would remonstrate upon occasion is shown by his remonstrance on the morning of the 17th. See, also, the testimony of Capt. Inman. I think the testimony of Capt. Mallows inadmissible by reason of his distance from Vineyard Haven. /

"(2) Failure to turn back to Vineyard Haven. By 8:30 or 9 a. m. the conditions were decidedly worse, the wind was increasing, and snow had begun to fall; but an increase of wind was certainly expected, and not greatly to be feared, while it was not unnatural to suppose that the snow fall would be confined to occasional flurries. After the snow squalls had grown almost to a blizzard, to turn back had become impossible, and an anchorage on the northern side of the sound was naturally and properly sought. Making reasonable allowance for the difficulty of the situation, I think the captain of the tug, in heading for the north shore of the sound after passing Half Moon Buoy, was taking the proper course.

"(3) Anchoring too far to the south. After the tug headed to the north at 11:15 a. m., the condition of things became worse than ever. The captain kept a course between north and northeast for an hour or more, probably for less than an hour and a half, inasmuch as some time must have been taken in anchoring and in bringing the tow into the wind, and even the tug was anchored at 1 p. m., according to the engineer's log, which seems to me the most trustworthy. The distance from Half Moon Buoy to the anchorage designated by the captain is about six and a half nautical miles. The captain's statement of the place where he came to anchor is to be preferred to the statement of the captain of the Indian Ridge, for the bearings taken by the latter determine nothing except that they were inaccurate. The Handkerchief Lightship does not bear southeast from Bishop and Clerks. Considering the distance of the anchorage from Half Moon Buoy, some six and a half miles, the time taken in traversing that distance, not over one and a half hours, and Capt. Rood's estimate of his rate of speed during the passage, four miles an hour. it is hard to see how he could have thought himself further to the northward than he actually got. In this respect, as in some others, I fear he was not quite ingenuous. Upon the whole, however, considering all the circumstances, I think that the libelants have not shown him to be at fault in anchoring when and where he did. The burden of proof is upon them. That, in other respects, his navigation up to the time of anchoring was unexceptionable, is not contested. The tug was on hand to render assistance as soon as the St. Nicholas got adrift, and the captain of the St. Nicholas distinctly says that to save the barge was then impossible. It follows, therefore, that the tug is not to blame for the damage done to the St. Nicholas and its cargo. The case of the Excelsior is different. According to the tug's log, which I accept in preference to the vague statements of Capt. Woodhouse, the Excelsior went adrift at 2:20. The tug got under way at 5 o'clock. Two hours and a half is too long for a tug boat to take in getting under way in a case of extremest need. The difficulties were considerable, but the emergency was great. When the windlass broke down at 2:30, the attempt to repair the donkey engine should have been accompanied by the unshackling of the chain, and the earliest way of escape should have been taken. The process of unshackling, and thus slipping the chain cable, took not over half an hour, I rather think considerably less; and, if it had been undertaken immediately upon the failure of the donkey engine, I think the tug might have reached the Excelsior. I am compelled to say that I do not find the captain's answers concerning this part of the occurrences to be quite frank. He certainly left upon my mind the impression that a large proportion of the time between 2:20 and 5 o'clock was spent in unshackling the chain, whereas the time so spent is shown to have been pretty short by the clear and frank testimony of the engineer. Indeed, the captain's testimony upon this point has caused me to attach less weight to his testimony on other points than I should otherwise have done. I find, then, that the tug was in fault in not proceeding sooner to the relief of the Excelsior. Without meaning to imply severe moral censure upon the captain of the Carbonero,

yet, taking his appearance on the stand and his whole story together, I think he was blamably wanting in energy and skill in not getting quicker under way.

"It was contended that this delay was not the cause of the Excelsior's loss. The rule applicable to this contention is stated in The Pennsylvania, 19 Wall. 125, 136, 22 L. Ed. 148: 'In such a case the burden rests upon the ship at fault of showing, not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.' Heavy as is this burden, I think the tug has sustained it. Let us examine what could possibly have been done. Apparently the conditions were no better at 3 o'clock than they were at 5:30. There was more daylight, but want of daylight was not suggested as a reason why the St. Nicholas was not saved. In the first place, I do not believe that the crew of the Excelsior would have been willing to remain aboard of the barge through the night, attached to the tug by a hawser, and without an effective anchor on either vessel. Unless they remained on board, the barge could not have been saved; for it would clearly have been impossible both to save the Excelsior and to take off her crew. Secondly, had the barge's crew been willing to remain, and had an attempt been made to save the Excelsior by carrying a hawser to her, I think the attempt would have failed, as it is agreed it would have failed later in the case of the St. Nicholas. Thirdly, had the tug been able to make fast to the barge, and had the hawser held, the tug could have done nothing but hold the barge by the hawser and by steam power; for the tug's large anchor could not then have been picked up, the small anchor would not have held, and to make fast either to the Indian Ridge or to the St. Nicholas, even if possible, would have been manifestly unwise. To go off with the Excelsior to a place of safety, leaving the other barges to their fate, would have been highly improper; and so, even if the tug had been able to save the Excelsior until the St. Nicholas went adrift, the former must then have been cast off, in order to save the crew of the latter. As has been said, doubtless there is a heavy presumption against the claimant; but I think it has been overcome. To conceive a rescue of the Excelsior by the Carbonero at 3 o'clock or thereabouts would, it seems to me, call for the exercise of an extravagant imagination,—of an imagination considerably more extravagant than would have been called for to conceive an escape by means of a lookout in the case of The Farragut, 10 Wall. 334, 19 L. Ed. 946. I find, therefore, that the fault of the tug in not sooner reaching the Excelsior did not contribute to the loss of that barge. The libels must be dismissed, but, in view of the conduct of the tug, without costs."

Henry M. Rogers (Robert M. Morse and William M. Richardson, on the brief), for appellant.

Eugene P. Carver (Edward E. Blodgett, on the brief), for appellee.

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

PUTNAM, Circuit Judge. The general facts are sufficiently stated in the opinion of the learned judge who heard this case in the district court. This, however, is subject to the observation that, although that opinion states that the tug's donkey engine broke when she tried to get up her anchor, we must hold ourselves not bound to this particular expression. It is sufficient on this point that we agree with the conclusion of the district court that the record fails to show that whatever did occur arose from the "unseaworthiness" of the tug, as that expression is applied to cases of this class. We agree with that court that the libelant below has not maintained the preponderance of evidence necessary to show that the tug was

at fault for going to sea from Vineyard Haven, or for not returning to that port, or for anchoring where she did anchor, in view of the circumstances under which she anchored. We also agree that there was no fault on the part of the tug so far as the St. Nicholas was concerned.

The tug claims that the Excelsior went adrift by reason of her chains parting, and that the parting of the chains was caused by the barge having insufficient length of chain or by the chains being too light. These propositions are not sustained. On the other hand, the log of the tug shows that this barge dragged her anchors, and this is supported by proofs which show that the barge did not go off so rapidly to leeward as she would have gone if she had parted her chains. Whether or not she subsequently parted her chains is not of consequence on this branch of the case, because, in the absence of assistance from the tug, the disaster which resulted in the loss of the Excelsior and her crew was unavoidable from the time she began to drag. It is true that the Excelsior only had 60 fathoms of chain; but the evidence is not definite enough to show that this was a fault, or, more especially, that, if a fault, it was a contributing one.

The result is to leave only the question whether the tug is responsible for the loss of the Excelsior by reason of not going to her assistance sooner. We think that the rule stated in The Gladiator (decided by this court May 23, 1897) 25 C. C. A. 32, 79 Fed. 445, applies here. There we said that the Gladiator was a powerful coast tug, with all the appliances and crew which the expression implies, and that she was inexcusable in that she did not use them for the relief of the schooner, a part of her tow and in peril, so far as it was practicable for her to do so. In other words, we are of the opinion that it was a part of her contract of towage that, under the circumstances of this case, the tug should go promptly to the relief of the Excelsior as soon as she found the barge was adrift. Carv. Carr. Sea (3d. Ed.; 1900) § 339; Kenn. Civ. Salv. (1891) 87 et seq. Of course, there may be circumstances under which, by reason of stress of weather, the only relief which a tug can afford her tow becomes of an extraordinary character, and therefore salvage service, rather than an incident of the towage contract. This, however, was not the fact in the case at bar. We therefore agree with the learned judge of the district court that the tug was guilty of a breach of the contract of towage, in that she did not promptly slip her cable as soon as she found that her donkey engine would not work the windlass. The difficulty in the case is with regard to his conclusions to the effect that all efforts of the tug to relieve the Excelsior would have been futile, so that the case is one in which damages cannot be awarded, because no damage in fact arose from the lack of diligence on her part.

It is maintained that it is apparent that all efforts of the tug to rescue the Excelsior would have been futile, even if promptly taken, because she was on hand to render assistance as soon as the other barge, the St. Nicholas, got adrift, and yet her captain testifies that

it was impossible to save her. The line of reasoning appears to be that, because it was impossible to save the St. Nicholas, it would therefore have proven impossible to have saved the Excelsior. The details of the reasoning in this direction we need not repeat, as they will be found in the opinion below. The opinion also adds that, to have gone off with the Excelsior to a place of safety, leaving the other barges to their fate, would have been highly improper. It concludes that the fault of the tug in not sooner reaching the Excelsior did not contribute to the loss of the barge. The mate of the Carbonero testifies that she might have run a hawser to the St. Nicholas, but that the crew of the barge was not sufficient to have hauled it aboard. The master of the tug testifies that he did not try to run a hawser to the St. Nicholas, and that her crew could not have handled one. The master of the St. Nicholas testifies that she had a donkey engine, and carried three men besides himself. He also testifies that no attempt was made to carry out a hawser from the tug, and that it was impossible to do it. The log of the Carbonero shows that the barge Excelsior began to drag her anchor at 20 minutes past 2, and the fact was at once known aboard the tug. The St. Nicholas went adrift about 5 o'clock, some 2½ hours later, almost at the same time that the tug slipped her cable, and the log of the Carbonero shows that she rescued the crew of the St. Nicholas at 7 o'clock. The log of the St. Nicholas states that at 1 o'clock the wind was blowing a gale, at 3 o'clock it was still increasing, and at 5 o'clock it had become a hurricane. Mr. Smith, the observer at Boston, testifies that the velocity of the wind that afternoon did not represent a heavy gale; that it was not unusual; and that the danger signal was hoisted because a wind of that velocity is supposed to be dangerous to the lighter class of shipping. That the tug was entirely able to cope with it is evident from the fact that, after she rescued the crew of the St. Nicholas, she lay to all night near the barge Indian Ridge without difficulty, although the Highland Light weather report shows that the velocity of the wind had not substantially abated at 10 o'clock in the evening, at which time the report in the case closes. There was no difficulty which would have prevented this powerful tug from promptly slipping her cable and going to the relief of the Excelsior as early as 3 o'clock in the afternoon. The barges were fitted for towing on the Atlantic coast; so that a presumption exists that the Excelsior was properly equipped for taking aboard a hawser of sufficient size for towage purposes, and that she had the proper steam appliances therefor, although the libelant failed to prove the facts in this regard.

The state of the wind at the time the tug reached the St. Nicholas was, as we have seen, more severe than when the tug might have reached the Excelsior. Moreover, the evidence shows that, after the barges went adrift, their windlasses and winches became iced up, and, of course, their crews were every hour becoming more and more chilled and enfeebled. On the whole, nobody testifies that it would have been impossible to have rescued the Excelsior at 3 o'clock

in the afternoon, and the condition of things was so different at that time from what it was when the tug reached the St. Nicholas that we cannot properly reason from one to the other. All this leads to an expectation that, if the tug had slipped her cable promptly, she would have accomplished something in behalf of the barge Excelsior, and that if we could regard ourselves as marine experts accustomed to emergencies of this nature, and familiar with the particular portion of the New England coast where this wreck occurred, and with the power and capabilities of tugs and barges of the character in issue here, we would, on this record, be satisfied to a reasonable probability that, if the tug had done her duty, the barge and crew would have been saved. But although the whole crew of the Excelsior was lost, so that the libelant could not give us the benefit of their evidence, and is therefore excusable to that extent, yet it has failed to prove how the barge was equipped for an emergency of this character, and even what was the number of her crew. Moreover, the parties have failed to bring before us the testimony of experts in regard to the probable capability of a tug like the Carbonero in the state of weather described, and whether, probably, she would have been able to run a hawser aboard the Excelsior, and in regard to the disposition which could have been made of that barge if the tug had succeeded in getting her in tow. The court is also entirely without evidence whether, after anchoring the barges, it was the duty of the tug to search for a better lee, and whether she could have found it if she had searched for it, or whether, under the circumstances and consistently with her duty to the other barges, she could, in any way, have towed the Excelsior to a safer anchorage if she had been recovered, or whether, in the event this could not have been done, the tug could, with or without the use of the Excelsior's anchors, have kept steam on and held up the barge during the night.

If the rule applied to the tug by the court below, cited from The Pennsylvania, 19 Wall. 125, 136, 22 L. Ed. 148, had been the appropriate rule, there is no doubt that we would be compelled to reverse the decree of that court, and hold that the loss of the Excelsior was the result of the misconduct of the tug; but it is only in cases of a statutory fault that it rests on the offending vessel to show that the loss could not have been caused by her offense. The case at bar, with reference to the question whether, the tug being in fault and the barge having been lost, the tug must therefore be charged with the loss, depends on whether or not the fault of the tug did in fact cause the loss. This, again, depends on the other question whether, if the tug had not been in fault, she could have rescued the Excelsior, and could have either put her or held her in a place of safety. No statutory rule is involved, and the conclusion is to be reached in the ordinary course in admiralty. This is the distinction which has been made by various courts, and especially by this court in our opinion passed down in The H. F. Dimock, 23 C. C. A. 123, 77 Fed. 226, 230, and in The Columbian, 41 C. C. A. 150, 100 Fed. 991, 993.

Under the circumstances, the fault of the tug was gross, and the natural presumption against her is very great. In view of the expedients which masters of steamers and sailing vessels find unexpectedly at hand, or within their ingenuity, when acting boldly and promptly in a marine stress, we are naturally inclined to the belief that, if the tug had done her duty, she would have found some way of rescuing the Excelsior, and that, therefore, the loss is chargeable to her. Nevertheless, on the state of the proofs, it is impossible to reach a conclusion on this proposition which will justly satisfy the mind of the court. Indeed, our conclusions might be only guesses. Rude v. Wescott, 130 U. S. 152, 167, 9 Sup. Ct. 463, 32 L. Ed. 888. While, therefore, we disapprove the particular line of reasoning of the learned judge of the district court which leads to a conclusion, in behalf of the tug, that efforts on her part would have been futile, we think it is within the power of the parties to produce, on the one hand and the other, more satisfactory evidence than the record now contains as to the means which were available for the relief of the Excelsior in the conditions which existed, and with regard to the probable result if those means had been employed. If the lack of evidence had been merely the omission on the part of the Excelsior to prove what resources she had, either for passing out a hawser or for taking one aboard, or for obtaining a better holding in case she had been towed back into a place of comparative safety, we might have reached the conclusion that she had not given the case the benefit of all the facts to which it was entitled, and that, therefore, she had left the court to conjecture when she might have aided it in ascertaining the reasonable probabilities; but with regard to the topics to which we have referred, and as to which we are unable to reach a justly satisfactory conclusion, we think that neither party has given us all the aid which, by reasonable diligence, it might have given us. Therefore we are of the opinion that further investigation should be made by the court below, without either party taking anything by this appeal. If no further proofs are adduced, that court should reaffirm its decree.

The decree of the district court is reversed, and the case is remanded to that court, with directions to proceed in accordance with our opinion filed this day, and neither party will recover costs of appeal.