## THE CARBONERO (2).

### READING CO. v. MUNSON.

(Circuit Court of Appeals, First Circuit. April 24, 1903.)

#### No. 436.

1. TUG AND TOW—LIABILITY OF TUG FOR LOSS OF TOW—BURDEN AND MEASURE OF PROOF.

Before a tug can be held in damages for the loss of a tow which drifted from her moorings where she had been anchored during stormy weather, the court must at least have a reasonable apprehension, from the facts and expert opinions developed in the evidence, that the tow would have been saved in the exercise of good seamanship if the tug had gone promptly to her assistance.

2. SAME—TOW BREAKING FROM ANCHORAGE IN STORM—DUTY OF TUG.

A tug cannot ordinarily defend against liability for failure to go to the rescue of a tow which had broken from her anchorage in a storm on the ground that, as the tow had lost her anchors, and the tug would have been obliged to slip her own, which she was unable to raise by reason of the breaking of her windlass, she could not have handled the tow if recovered, having due regard to the rest of the fleet. Such a defense is ordinarily too speculative to be considered under the rules of the admiralty courts.

3. SAME.

Evidence considered, and *held* insufficient to establish the liability of a tug for the loss of her tow by striking upon a sunken reef, which was, in effect, a lee shore, because it was not proven that good seamanship would have required her to attempt more than the rescue of the crew, owing to the thick weather, which prevented a knowledge of the position or distance of the reef toward which the tow was known to be drifting.

Appeal from the District Court of the United States for the District of Massachusetts.

Robert M. Morse and Henry M. Rogers (William M. Richardson on the brief), for appellant.

Eugene P. Carver and Edward E. Blodgett, for appellee.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. This is a libel against the tug Carbonero for alleged neglect of prompt action towards rescuing her tow from peril, resulting in the loss of the latter; and this is the second time the case has been before us on appeal. On the first occasion we passed down our opinion on January 9, 1901. 45 C. C. A. 314, 106 Fed. 329. We refer for the facts to that opinion and to the opinions in the District Court, except so far as they are necessary to be restated, or further stated, for present purposes.

The vessel libeled in this case, the Carbonero, was a seagoing tug, engaged in towing in line astern three coal-laden barges, the St. Nicholas, the Indian Ridge, and the Excelsior. On account of bad weather, about 1 o'clock in the afternoon of February 16, 1898, the tug anchored her barges in Nantucket Sound, in the bight frequently called "Chatham Bay," bounded northerly and northwesterly by the southerly face of Cape Cod and easterly by Monomoy Beach and the

Handkerchief Shoals. The air was thick, with a squally snowstorm. The captain of the Carbonero intended to get as good lee as he could under Bishop and Clark's Shoal, not daring to run further north. He was compelled to rely on his courses, supposed speed, and soundings. When he had run, as he thought, to a point well under the lee of Bishop and Clark's Shoal, he anchored in seven fathoms of water; but there are various places in this bight or bay where there are seven fathoms, so that, on the weather clearing the next morning, he found he was fully a mile and a half southerly of his supposed point of anchorage, and somewhat to the easterly thereof. He was between three and four miles distant westerly from the Handkerchief Shoals, while he supposed himself to be four or five miles distant therefrom, and somewhat northerly thereof. We have already determined in our former opinion that up to this point the tug was not in fault, which necessarily involved a finding that the weather was so thick with squalls that, even with the aid of her lead, she could not locate herself within a mile or two miles of her supposed position.

There is abundant anchorage in this bight where a good lee could have been found by running farther in and to the northward; but, as we have already said, we held in our former opinion that in this particular the judgment and action of the master of the tug must prevail. This, however, relates only to his first selection of a place of anchorage, which was made under no emergency except that of the danger of coming in collision with other vessels at anchor had he attempted to proceed farther north. Our then conclusion had no relation to a subsequent emergency involving other elements; as, for example, the loss of the tug's heavy anchor, and the ultimate loss of the anchors of the barge Excelsior. When the tug prepared to anchor, she headed into the wind, and then dropped the barges in the order in which they had been towed. This left the St. Nicholas the farthest to the west, the Indian Ridge next, and the Excelsior the farthest to the east. The tug anchored in the neighborhood of the Indian Ridge, thus properly placing herself near the center of her tow. The Excelsior drifted from her moorings, and went to pieces on the Handkerchiefs, with a loss of all her crew. It is claimed that the tug did not go to her relief seasonably, and is, therefore, liable to make good her value.

The Handkerchiefs are always water-covered. The main shoal, which presents its face to the westward, pitches off very abruptly, so that at medium low tide soundings at one point rise almost immediately from four or five fathoms to three or more feet. The wind and current were setting towards it. For the purposes of this case, it had all the conditions of a dangerous lee shore.

The new proofs now adduced have made positive and clear the construction, equipment, and, so to speak, the ability, of both the tug and the Excelsior. The tug was a powerful vessel of 800 horse-power, with a crew of 15 men. The barge Excelsior had the usual crew of four men, and was fully equipped with modern instrumentalities, including steam power, necessary for handling either her own hawsers or those of the tug. In our former opinion, after reciting some of the facts as then developed to the court, we said:

"All this leads to an expectation that, if the tug had slipped her cable promptly, she would have accomplished something in behalf of the barge Excelsior."

We also said:

"In view of the expedients which masters of steamers and sailing vessels find unexpectedly at hand, or within their ingenuity, when acting boldly and promptly in a marine stress, we are naturally inclined to the belief that, if the tug had done her duty, she would have found some way of rescuing the Excelsior, and that, therefore, loss is chargeable to her."

We said, in substance, however, that we were not content to pass on the case without an effort on the part of all concerned to develop further facts; and we especially indicated our need of the assistance of the opinions and suggestions of marine experts, accustomed to emergencies of the character involved in this litigation, and familiar with this particular portion of the New England coast. The result has been the production of a large amount of expert testimony, which, with other additional proofs, enables us to comprehend the case as well, perhaps, as it is possible to make it comprehensible.

Some expressions in our former opinion seem to have led the parties to the understanding that, with reference to the question whether the ultimate loss of the Excelsior was to be charged to the lack of diligence on the part of the tug in pursuing her, we intended to say that there was a "presumption" against the tug, using that word as affecting the burden of proof. We did not so intend. The presumption we spoke of was only equivalent to the expectation which our opinion shadowed out; that is to say, that on the then state of the evidence there was a natural expectation on our part that, if the tug had used diligence, she would have overcome the difficulties that stood in the way of rescuing the Excelsior. We, however, held that, on the indefinite proofs before us, we could not give this presumption or expectation, whichever word might best be used, such force as to operate in such way as, in the usual language of the common-law courts, would throw the burden of proof on the tug.

Before we can hold the tug in damages, we must at least have a reasonable apprehension, from the facts and the opinions developed before us, that the Excelsior would have been saved in the exercise of good seamanship if the tug had promptly gone to her assistance. The rule stated by us in The Columbian, 41 C. C. A. 150, 100 Fed. 991, 993, applies. There we held that, when the alleged faults concern only the ordinary rules of navigation, it must appear not only that there were faults, but that they did in fact contribute to the result. To put it in a more practical form: The true question is whether, on this record, the proofs and probabilities support the conclusion, not merely that it was possible to save the barge Excelsior, but also that, if the tug had gone to her relief promptly, good seamanship would have required that her rescue should have been attempted, notwithstanding the consequent hazard to the crews of both vessels.

When the tug anchored, the wind was blowing about 25 miles an hour, and it afterwards gradually increased, so that, according to the weather report, it varied from 27 miles to 32 miles in the afternoon, reaching the maximum of 36 miles at half past 5 o'clock. This was

an off-shore wind, although, at the place of anchorage, it is said by some of the witnesses to have had a range of 30 miles. Mr. Smith, the United States local forecast official at Boston, testifies that even 36 miles an hour does not indicate a very heavy storm, and Capt. Durkee, a tug master of extensive experience in the locality in question, called by the libelant, and whose testimony appears as well as that of any expert, states that a wind of from 30 to 35 miles an hour in this vicinity is quite frequent, and to be expected in the towboat service. Also, Capt. Henry Lund, likewise a tug master of much experience, the captain of the Knickerbocker, and whose testimony also appears reliable, testifies that a storm of the character described in the interrogatories put to him would not be unusual in this locality in the winter season.

There can be no question on the evidence that when these barges got into the trough of the sea in weather such as occurred at that time their decks would wash freely, and that at such times it is very difficult, if not impossible, for the crew to pass fore and aft. That these barges so wash is undoubtedly due, to some extent, to their somewhat peculiar construction. They were heavily laden with coal, and their freeboard was only about four feet amidships, while they run up to eleven or twelve feet forward. Their rails were constructed with five inches open below, and about two feet solid above that; thus giving full opportunity for wash.

Nevertheless, the sea was not immoderate in such a sense that it alone would have prevented the tug from relieving the Excelsior. The test in this respect is that the St. Nicholas, which later in the afternoon went ashore on Monomoy Beach, where she felt the full force of the storm, and where she laid through the night and for a day or two afterwards, was found in such condition that the agent of the Carbonero describes her as follows: "Apparently all right, only she was badly iced up, and had considerable water in her." A portion of her engine room had been washed out, as we will see farther along, but the entire damage to herself and her cargo alleged in the libel was only $1,200. It cannot be doubted that this barge, heavily laden as she was, and lying on a lee shore exposed to the full force of the wind, would rapidly have gone to pieces if the weather could be justly described as extraordinary at this particular locality. The condition of the Excelsior was not so easy, and she was found not worth saving, although her hull was not broken up.

The thermometer was about 21 degrees above zero. The air was thick with a squally snowstorm; but the captain of the Carbonero states that during the early part of the afternoon he could see from a quarter of a mile to a half mile. The record gives several practical tests in this respect. The Excelsior was in sight of the tug for about half an hour from the time she commenced to drag. Indeed, the weather was not so thick as to prevent the tug from following the St. Nicholas after half past 5—approximately sunset—overtaking her about 7 o'clock in the evening, and maneuvering about her sufficiently to get a line aboard and take off her crew. We are therefore led to conclude that, however the obscurity of the atmosphere may be

characterized by witnesses, and however different expressions which are commonly used from a relative standpoint may be availed of to describe it for comparative purposes, it was not such as to have prevented the tug from maneuvering in the neighborhood of the Excelsior in such manner as to have rescued her, if the conditions in other respects had not been unfavorable.

At the crucial period the tide was setting out at a rate of 2½ or 3 miles towards the Handkerchiefs. Nevertheless none of the difficulties we have discussed—that is, the sea, the wind, the snow, and the current—would have prevented the Carbonero from maneuvering in the early afternoon for the successful rescue of the Excelsior, because we have a demonstration otherwise in her movements in the evening with reference to the St. Nicholas, and her further movements at the same time in search of the Excelsior for nearly two miles up and down the Handkerchiefs, and within a half mile thereof. We ought to add that her conduct in this particular relieves her master of all suspicion of personal lack of courage or energy, after he was once freed from the dilemma in which he was placed in the early afternoon by the fact that the tug was equipped with a single, heavy, ground tackle, so that he was unwilling to partially cripple her by slipping it—a fact resting the fault charged in our earlier opinion on the tug rather than on him.

The opinions of those experts who testify from a knowledge of the facts rather than on merely hypothetical questions are, in this case, the more satisfactory, and add to the strength of this part of the libelant's positions. Capt. Woodhouse, of the Indian Ridge, testifies, in substance, that, if the conditions aboard the Excelsior were the same as aboard the Indian Ridge, the tug could have saved her, either running her hawser aboard the barge or taking one from her. He goes into details in this matter, to which we need not refer. Next, Capt. Lennan, a witness for the claimant, running a tug for the Standard Oil Company, with experience in this locality at all seasons of the year, on cross-examination testifies that he had picked up vessels that had dragged their anchors "under almost the same circumstances as this case is tried on." Of course, the development of his evidence shows that the circumstances to which he refers were somewhat different; yet a reasonable judgment of human testimony leads to the conclusion that he weighed the conditions as a whole to be as troublesome as those shown at bar. Likewise, Capt. Brown, another tugmaster, and a witness for the claimant, details an instance of his losing a barge and recovering her a week before he testified, in a "northwester," with everything iced up; "a very difficult job," as he says.

The questions put by the claimant to the mass of his experts, if not to all of them, involved the hypothesis that the hawsers of both the tug and the barge Excelsior were exposed, and that, therefore, they became so iced up that neither could have been used. It is unnecessary to illustrate at length the effect of this method of interrogation. We are compelled to disregard its results, because the case shows that the icing up of the tug's hawser involved no serious difficulty, while the hypothesis of the icing up of the barge's hawser

remains a mere suggestion, which, under the proper rules guiding courts in determining facts, cannot avail the claimant without proofs to justify it; and there are none such in the record.

The proofs with reference to the tug's hawser can be summed up as follows: The witnesses agree that, in giving her hawser to the barge, the crew would use, possibly, 15 fathoms. Beed, the mate of the Carbonero, who apparently had immediate charge of the hawser, testifies that, in order to thaw it after it came aboard on anchoring, the crew would put it inside of the upper fireroom; that, when the Excelsior was sighted, dragging her anchors, they had run in five fathoms; and that, in order to pass it aboard the barge, they needed a pliable end of from eight to ten fathoms. He also testifies that to have put into the fireroom ten fathoms additional would have taken "fifteen or twenty minutes more." His testimony must be accepted in this particular; so that, although he also testifies that it would have been necessary to have begun getting the hawser in readiness to run aboard the barge as soon as her recovery was undertaken, it is difficult, nevertheless, to understand why a pliable end of the length needed could not easily have been secured while the tug's anchor was being weighed.

But, as already stated, the Excelsior was supplied with a sufficient hawser, which had been constantly in use for towing on this trip, and had proved ample for that purpose. The claimant attempts to meet this by evidence as to the condition of the hawser two days after the wreck. It was then lying in bights on her deck. What evidence there is on this point affords one theory for the claimant and another for the libelant. It is impossible to reason back from it for any satisfactory definite purpose. The evidence is that the barges were so constructed that it was more easy and more natural to house the hawser beneath the forecastle deck as it came aboard than to leave it exposed. This was promptly done that day on the only other barge whose hawser was in use; and the evidence positively shows that such was the practice. Indeed, the probability that the hawser would thus be housed was so great that the claimant admits that if it was not done the barge must have been shorthanded, or her crew incompetent, or she was washing so that they could not stay forward. That the barge was not shorthanded is clearly proven, and that the crew was incompetent is not suggested by anything in the record. That the vessel was washing so that they could not stay forward is necessarily contradicted by the claimant's position in this respect, as it certainly would have required more labor to have laid up the hawser in bights, as he maintains, than to have housed it. Neither could have been done unless the crew were forward. At any rate, it is safe to say that the claimant's hypothesis involves more difficulties than any suggested by the libelant's, and that it is not sustained by any proofs or probabilities of a definite character.

The claimant also maintains that the deck of the Excelsior must have been so iced up that the crew, if aft, could not have gone forward for any purpose. It is said that when she began to drag they were even unable to give any signal to the tug, but it is established

that they gave the same signal which the St. Nicholas gave when she went adrift—her flag in the rigging—for it was found awash two days after the wreck. The St. Nicholas gave no whistle because the engine room had been washed full of water. For aught that can be known, however, the Excelsior did signal with her whistle, as the weather may have been too thick, and she may have been too far to the leeward, for it to be either seen or heard. This claim as to the condition of the decks of the barge is supported only by the opinions of the claimant's experts as to what it might have been, and there is not sufficient evidence in the record to enable us to characterize it except as a mere theory. It is more than met by the evidence from the Indian Ridge directly to the facts that she was iced up from the foremast to the after part of the cabin, and some forward of the foremast, but not a great deal; that her windlass was in good condition at 3 o'clock; that there was no water in the engine room, and that the engine was in working order. Even more positive in the same direction are the facts with reference to the St. Nicholas. Her captain testifies that at 3 o'clock the condition of his crew as to "strength, health, and spirits" was all right, that the barge was not then much iced up, and that his engine was then all right, so far as he knew. Even after she went adrift, at half past 5 o'clock, although they could not get into the engine room, as already stated, his crew did get forward, and set a part of the fore staysail. Therefore the facts proven fail to support the theory of the claimant that the crew of the Excelsior could not have gone forward at 3 o'clock, or thereabouts.

The claimant maintains that the evidence shows that, when the Excelsior was visited after the wreck, the windlass was found to have been uncovered, and that, therefore, it must have been considerably iced up at 3 o'clock. It is quite as impossible, however, to reason back with any degree of satisfaction from what is testified to with reference to the condition of the Excelsior's windlass at the time the wreck was visited, as with regard to her hawser.

The claimant urges with much force that any efforts on the part of the Carbonero must have been useless, because the Excelsior had lost her anchors, the tug had lost her anchor, and because, therefore, there was no way in which, under the circumstances, the tug could have handled the Excelsior if she had recovered her, having due regard to the rest of her fleet. The proposition thus presented is a plausible one, and some of the libelant's expert witnesses testify in support of it. If the tug had promptly gone to the Excelsior, and, under the existing circumstances, her master had acted on his decision, then formed, that, on account of this difficulty, his duty would be best performed by saving the crew and abandoning the barge, it is certain that no court could properly revise his conclusion. If this had occurred, it would have been the end of the case; but, as it did not, this particular line of defense must fail, in view especially of the judicium rusticum of the admiralty with reference to contingencies not existing, which we explained in Randall v. Sprague, 21 C. C. A. 334, 74 Fed. 247. There we gave demurrage to the libeling vessel although the evidence was almost overwhelming that, if

she had been seasonably loaded, she could not have gone to sea on account of the ice in the harbor where she was detained. We overruled this defense, concluding in regard to it, at page 336, 21 C. C. A., and page 250, 74 Fed., as follows:

"In view of the infinite variety of maritime contingencies and possibilities, it invites us to a field of speculation in this and other probable cases which the practical rules of the admiralty courts are intended to avoid."

Moreover, Capt. Durkee has shown—as we think, satisfactorily— that the tug could safely have beached the Excelsior on the flats to the north under the lee of the land, where she could have rested easily until the emergency was over, and this without danger to herself. While we held in our former opinion that the tug was not at fault for anchoring at first where she did, yet we have explained that this was under the then existing circumstances, apparently involving ɔ special hazard in her so anchoring; and we have stated that our nnding in this respect would not relieve her from her obligation to find other anchorage after new dangers developed through the loss of moorings by the Excelsior and the St. Nicholas. It is enough to say, however, that in maritime contingencies aid comes in strange ways to those who promptly and unflinchingly perform a duty close at hand, and to apply Randall v. Sprague. With reference, therefore, to all the topics which we have considered, although everything maritime involves contingencies and uncertainties, so that conclusions with reference thereto can never be worked out with positiveness from given premises, proceeding, however, as in the necessities of maritime affairs we must proceed, we are of the opinion that the case rests with the libelant.

A more serious difficulty remains to be considered. We have explained that under the circumstances the Handkerchief Shoals offered a dangerous lee shore, though submerged. It is apparent that in this weather efforts to get a hawser to or from the barge would have involved drifting for a considerable period longer than efforts for rescuing the crew. It is also evident that a tug, under such circumstances, would not be justified in putting in extreme danger the lives of a crew, which might, perhaps, have been saved, for the sake of mere property values. It was undoubtedly in the light of these facts that Capt. Rood testifies:

"Q. Now, captain, just tell, if you will, why you would have taken the crew, and not attempted to have got a hawser, if you had gone to her at that time? A. Tell why?
"Q. Yes. A. I thought I was getting dangerously near Handkerchief Shoal. I thought I was at the time as near as I cared to go under those conditions; and, of course, the longer I was drifting to leeward and fooling with that barge, the nearer I was getting to Handkerchief."

Also, from the same point of view, Capt. Lund, to whom we have already referred, testifies:

"Q. I will ask you, if you had got down there in a snowstorm, not knowing how far you were from shore except your own judgment, judging from the distance you had gone from the place where the barge drifted from anchor, and if you couldn't see, after you had got her in tow, whether or not you would have attempted to go further up on the north shore, or what would you have done? A. I will tell you. If it was thick where I was, and it was

three miles off shore, I shouldn't have attempted to reach the barge, but I should have got the crew off as quick as possible, and got away from there."

The claimant has called our attention to this topic of lee shore by numerous extracts from the proofs, but they are mostly mixed with the hypothesis of the frozen hawsers, which we have sufficiently noticed. He does, however, refer to some facts which were brought out by the libelant's witnesses; among the rest the following: In the cross-examination of Capt. Hansen he calls attention to the circumstances of the Excelsior having drifted from her anchorage, and to the fact that the tug could not have known how near the Handkerchief Shoals she would have run in pursuing the barge; and he asks whether, in case the tug had come up with the barge, it would have been more prudent for her to have saved the vessel or to have taken off the crew. Capt. Hansen's first answer was that he would leave that to the captain's judgment, etc. Then these questions and answers follow:

"Q. It would be a pretty difficult thing to determine, wouldn't it? A. Yes, it would be difficult. Well, I don't know about taking the crew off. That would not be so very difficult; but getting a hawser to her, if he didn't know exactly where he was, that would be difficult.

"Q. You couldn't blame a man for taking the crew off and letting the barge go under those circumstances, could you? A. I would not; no, sir. I should save life, if possible.

"Q. And do you think it would be a very difficult thing to save the barge under those circumstances, even if it had been possible? A. Well, I should judge so."

Capt. Hansen was again re-examined by the libelant, and finally answered as follows: "Well, if the barge had plenty of water round her, and the man knowed exactly his position, he could take his chances of giving him the hawser." It cannot justly be said that the proofs in the record meet either of these conditions.

Taking, as we think we justly may, for a test of its method of examining its own experts, the questions put by the libelant to its expert Capt. Durkee, it must be observed that they omit the element growing out of the fact that the Handkerchiefs were on the lee under the conditions we have stated. That element was, however, brought out by the claimant on the cross-examination. Capt. Durkee had testified on his direct examination that it was safe for the Carbonero to go down within three-quarters of a mile of the Handkerchiefs, because, as he said, "If I could see a half a mile, I could see the breakers on the shoal." But there is no evidence that on the afternoon in question, with the state of the tide at 3 o'clock, there were any breakers over the Handkerchiefs. He also states on cross-examination that, if he could see a half mile, he should go very close to the shoal, "sounding occasionally"; but he concludes that, "if you got into four fathoms in a storm" it would be "hard, with your steam," "to keep the tug off the shoals, and save the tug herself." As a result of this, he is finally, on cross-examination, put these questions, to which he makes the following answers, all referring to the Carbonero and the Excelsior:

"Q. Now, assume that the tug got down to where she was, and found her before she got into four fathoms of water, and the tug didn't know where he

was except by the soundings, would it have been proper and prudent for him to have attempted to have saved the barge, or should he have taken off the crew under those circumstances? A. That would depend upon the conditions he found them there.

"Q. But I will assume the conditions are these: Wind from the northwest, thirty to thirty-five miles an hour; two barges left back at anchor in this gale, he having slipped his chain, and the barge having drifted for an hour from the position where he had anchored toward Handkerchief, and he not knowing any more than that how near to Handkerchief he was, except the soundings. Under those circumstances, do you think, if he had got down and found her, it would have been safe and prudent for him to have attempted, with a stiff hawser on the tug and a frozen hawser on the barge, for him to have attempted to save the barge, or would it have been his duty to take off the crew? A. I don't think it would have been his duty to attempt to save the barge when he got into that water, not knowing where he was.

"Q. But you think he should have taken off the crew? A. Made an effort.

"Q. And go back to his other barges? A. Yes, sir.

"Q. I understand there is no way of telling from the soundings in that locality where you are? A. Not very good; no, sir.

"Q. Because in one place it may be five fathoms, and in another place right side of it five or six feet, and you can't tell whether you are on a shoal or not till you strike Handkerchief Shoal. That is true, isn't it? A. Yes, sir; the shoal comes right up.

"Q. And right along Handkerchief Shoal there is bold water within a quarter of a mile of it, isn't there? A. Yes, sir."

It is true that the foregoing questions, which were put by the claimant, persist in inserting the hypothesis of frozen hawsers, but the answers plainly disregard this element. While the difficulty of handling all the barges, and all the other difficulties to which we have referred, cannot operate directly in defense, as we have explained, yet they all come in at this point to sustain the views thus finally expressed by Captains Rood, Lund, and Durkee; and we are compelled to accept those views, and to hold that, on account of the lee made by the Handkerchiefs, under all the other circumstances of the case, prompt action and the exercise of good seamanship on the part of the Carbonero would probably have resulted in efforts to rescue only the crew of the Excelsior at the cost of the abandonment of the barge, even though it might seem to us that there was a possibility of saving both.

The decree of the District Court is affirmed, and the costs of appeal are awarded to the appellee.