## THE WILLIAM H. YERKES, JR.

### (District Court, D. Massachusetts. June 9, 1914.)

### No 704.

1. TOWAGE (§ 11*)—CARE REQUIRED OF TUG.
   The captain of a towing tug is under the duty to observe weather conditions and to exercise ordinary prudence as to the conditions of his voyage, having in view the qualities of his tug and the character of his tow.
   [Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

2 TOWAGE (§ 11*)—LOSS OF TOW—LIABILITY OF TUG.
   A tug which undertook to tow around Cape Cod a small lighter with a 5-foot side and a blunt flat bow, obviously not designed for sea service, *held* in fault and liable for the loss of the tow for proceeding over the shoals toward Vineyard Haven in the face of a choppy sea and a 25-mile wind instead of lying by for better weather.
   [Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

In Admiralty. Suit by John R. Burke against the steam tug William H. Yerkes, Jr.; the Doane Steamboat Company, claimant. Decree for libelant.

J. J. McCarthy and William E. Burke, both of Boston, Mass., for libelant.

Russell, Moore & Russell, of Boston, Mass., for claimant.

HALE, District Judge. This is a libel for loss of the lighter John the First, alleged to have been sustained by reason of negligent towing by the steam tug William H. Yerkes, Jr. Under an agreement entered into on September 26, 1912, the Doane Steamboat Company, the owner of the tug Yerkes, agreed for a lump sum to tow the lighter from Sandwich, Mass., to Wood's Hole Harbor. The contract of towage was an oral one; and there is a sharp conflict as to its terms. It is contended by the libelants that, at the time the agreement was made, the owners of the Yerkes were informed in respect to the size and age of the lighter, and were told that she would be put in condition to tow around the Cape; her gear standing about the deck would be made fast, hatches battened, hold pumped out, and all things necessary would be done in order to make the vessel fit for the trip; but nobody would be furnished by the libelant to go on the lighter; the agent of the tug was warned that the lighter was not a seagoing vessel; she was fit to go in smooth seas, and in ordinary weather, but was not constructed to go around the Cape in anything but fair weather; in other words, she was a lighter and had "got to have a chance, because she was not a seagoing vessel and would have to pick a reasonable time to go." Her build was obvious to any mariner. She was flat-bottomed, 70 feet long, 25 feet beam, with a 5-foot side and a blunt, flat bow; she was built for work on the canal, and obviously not for sea duty.

The claimant urges that the agent of the tug was informed that the

lighter was strong, staunch, and seaworthy; the outward appearance of the boat would tend to show a sufficient degree of stability for the work to be undertaken; there was nothing apparent in the construction of the lighter to charge the claimant with any notice but that she was fit for sea service; that she had inherent defects of which the claimant was not advised. The claimant further contends that there was no negligence in starting from Sandwich, or in continuing upon the course around the Cape; the weather conditions were good, and no disaster could reasonably have been anticipated; the claimant is liable for only reasonable care; and the lighter received such care throughout the towage service; that no negligence has been shown on the part of the tug, or of the claimant; and there should be no recovery by the libelant.

On October 3, 1912, at about 8 o'clock, the tug started with her tow. The testimony satisfies me that before leaving the canal the captain and crew of the Yerkes had full opportunity to make whatever examination of the lighter they found necessary; that it must have been apparent to any person of maritime experience that a small lighter with a flat bottom and a blunt stern was not a seagoing vessel, and would not be able to encounter heavy seas. The start was made in the morning; there was a fair wind and a good chance as far as Chatham. It appears from the official record that at 8 o'clock at Highland Light the wind was blowing 25 miles an hour. The 56 miles from Sandwich to Chatham was run in 10 hours. After leaving Chatham, the tug and tow proceeded at a speed of about 4 miles an hour, the wind southwesterly. They left Chatham at about 6 o'clock in the afternoon, the wind continuing to blow at about 25 miles an hour, and being characterized as a strong wind; they proceeded as far as Pollock Rip, and, turning there, headed up still more into the wind towards the Shovelful Shoal. After going around the Handkerchief Light ship, and at a point about 19 miles from Chatham, the lighter was seen to have a slight list to port; they proceeded, however, until about five miles east of Half Moon Shoal Buoy, the list increasing. At about this point the lighter turned on her side, and soon after seemed to "jump ahead." The tug, with what was left of the lighter, proceeded to Vineyard Haven Harbor, where she arrived at daybreak, and it was discovered that "all the tug had on her hawser was a part of the deck of the lighter."

The libelant does not impute negligence to the tug up to the time she left Chatham. He does contend, however, that, if her master had been a careful, prudent, and experienced mariner, he would have known, when he left Chatham, having in tow a flat-bottomed lighter, with a blunt bow, that he would not be able to go safely beyond Chatham, encountering a wind blowing, from the southwest, about 25 miles an hour; that a prudent mariner would have realized, if he proceeded beyond Chatham, he would encounter a short, choppy sea, and, if he still continued, heading up into the wind, there would be increased dangers as he proceeded westerly. The testimony shows that Capt. Parker of the tug had no experience in going around the Cape, and had no license to go as master of a vessel over the Shoals; that he

was not allowed to navigate in those waters except with a duly licensed pilot; that he had never been in charge of a vessel going over the Shoals, although he had taken the trip 12 or 15 times as mate under other captains. Upon this trip he had obtained the services of Capt. Swimm, a pilot of some experience.

[1] It has been repeatedly held that a tugboat cannot be considered a common carrier, or an insurer; the highest possible degree of skill and care is not required of her; but she is required to use reasonable skill and care. The want of such care is a fault rendering the tug liable. The captain of a tug is under the duty to observe weather conditions, and to exercise ordinary prudence as to the condition of his voyage, having in view the qualities of his tug and the character of his tow. The Margaret, 94 U. S. 494, 24 L. Ed. 146; The McWilliams Case, 74 Fed. 648, 20 C. C. A. 580; Consolidated Coal Co. v. Knickerbocker Steam Towage Co. (D. C.) 200 Fed. 840; Thompson v. Winslow (D. C.) 128 Fed. 73.

[2] Upon an examination of the whole testimony in the case at bar, I am of the opinion that the Yerkes was at fault. The tug had in charge a small lighter with a five-foot side, and a blunt, flat bow; built with no fitness for sea service. When the captain left Chatham with this craft, he knew that he would not be able to get a good lee on his way over the Shoals. With the wind blowing from the southwest 25 miles an hour, I think it was the part of a prudent mariner to stay in the lee of the Cape at Chatham, and await a favorable opportunity to go over the Shoals. Instead of doing this, Capt. Perkins continued over the Shoals in the face of a strong wind. After he had gone beyond Chatham, and when he came to Pollock Rip, he headed up still more into the wind towards the Shovelful Shoal. At this point a prudent mariner must have known, I think, that he was in great danger, with the craft he had in charge. In my opinion, it was not the part of a prudent mariner to tow beyond this point, with a 475-foot hawser, through a choppy sea, with the wind blowing at least 25 miles an hour. Capt. Perkins had not the necessary experience to know the dangers of his situation at this point. Capt. Swimm, the pilot, should have informed him of the perils he would be sure to encounter if he proceeded on his way to Vineyard Haven. When he had proceeded some 19 miles beyond Chatham, between the Handkerchief and the Half Moon Shoal Buoy, and the lighter began to show a list, it must have been evident to a prudent mariner that she was at that time filling with water. At this point, I think the captain should have turned about and tried to go back to a good lee at or near Chatham. He certainly would have been safer in adopting this course than in undertaking to go in the teeth of a strong wind towards Vineyard Haven. But, whatever may be said of the conduct of the captain at any time after the lighter began to show a list, it seems clear to me that he must be held in fault in leaving a good lee at Chatham and attempting to proceed over the Shoals in the face of a strong wind, with such a craft as he had in charge. If he had used the care, skill, and caution of a prudent mariner, he would have waited at Chatham for better weather. He seems to have proceeded with this tow very much as he would

have done with a seagoing vessel; whereas, it must have been evident to a mariner of any experience that the lighter he had in charge was not a seagoing vessel.

When this case was on trial, I adverted to the case of The Carbonero, 106 Fed. 329, 45 C. C. A. 314, Id., 122 Fed. 753, 58 C. C. A. 553, as presenting many facts quite similar to the case at bar. The alleged faults, too, were somewhat similar. In the Carbonero Case, it was alleged that those in charge of the tug used bad judgment in departing from Vineyard Haven with the tow, in threatening weather. It was contended, also, that they were negligent in failing to turn back. And the court held that there was no liability on the part of the Carbonero. The vessels towed in that case were coal barges, built for sea service. It is true they were heavily laden with coal, and had a freeboard of not over four feet. In that case, however, a question was not presented involving the negligence of a towboat captain in towing a lighter, obviously unfit for sea service. Each case must be decided upon its own facts. The issue in the Carbonero Case was so different from that in the case at bar that the court receives very little guidance from that case. In The Hercules, 73 Fed. 255, 19 C. C. A. 496, the Court of Appeals in the Second Circuit was dealing with the case of a tug towing two seagoing barges; and it was held that the tug was not liable, either on the ground that her master was not warranted in leaving the breakwater in bad weather, or because he did not turn back when he found the storm increasing, there being apparently as much danger from the shoals near the Capes in attempting to regain the breakwater in the darkness, as in continuing to face the storm. In that case, also, the tow consisted of seagoing vessels.

In the case at bar, no such service was undertaken. The proposition was merely to take the lighter around the Cape. The build of the lighter was apparent. The master was at perfect liberty to await a "good chance" before going around the Cape. He might have held on to his lee at Chatham. Even after he got by Handkerchief Shoal, and was headed for the Half Moon Shoal Buoy, when the lighter began to show a list, if he had turned back he would not, as in the case of the Hercules, have been facing a risk "apparently as menacing and real as any to which he was likely to be exposed by holding on." Even then, I think, he should have turned back, as I have before indicated.

The initial fault, however, as I have said, was not where the lighter began to show a list, but at the point where a good lee was left at Chatham. Under all the circumstances of the case at bar, I must hold that the captain was at fault; that he did not exercise the care of a reasonably prudent mariner in the towage service of the lighter in question; and that as a result of such negligence the lighter was lost.

Albert T. Gould, Esq., of Boston, is appointed assessor, to assess the damages in the case, and report to the court.