THE TRITON.

(Circuit Court of Appeals, First Circuit. February 4, 1904.)

No. 486.

1. TOWAGE—LOSS OF TOW—LIABILITY OF TUG.

A tug having two laden barges in tow, the entire tow being 2,300 feet long, undertook to pass through a narrow channel between two islands, instead of taking a safer course. After passing around a rock at some distance in front of the entrance of the channel, she was obliged to swing to port to make the entrance, and one of the barges struck a rock at one side of the entrance and was sunk. *Held* that, having exercised her option as to the course, she was bound to the strictest care, and must be charged with liability for the loss, in the absence of evidence to show that the barge was not properly following.

Appeal from the District Court of the United States for the District of Massachusetts.

Eugene P. Carver (Edward E. Blodgett, on the brief), for appellant.

Robert M. Morse and William M. Richardson, for appellee.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. This is a libel against the steam tug Triton, alleging that she was negligent in rendering towage services, and claiming damages on that account. The decree of the District Court was for the libelant, and the claimant of the tug appealed.

On January 16, 1898, the tug left Clark's Point, below New Bedford, in Buzzards Bay, bound for Boston, with two coal-laden barges in tow. The barge immediately following the tug was the Pine Forest. The length of the entire tow was about 2,300 feet. Everything went well until near 4 o'clock in the afternoon. The weather was clear, with light winds, and with a very moderate set of the current. The normal rise and fall of the tide in Buzzards Bay is only about three feet. The tug, as usual, had the option of determining the courses, within certain reasonable limits. She might have gone to the westward of Cuttyhunk, where she would have had a clear seaway. Instead of that, she undertook to pass through the narrow channel between Pasque Island and Nashawena Island, known as "Quicks Hole." Lying outside of the entrance to Quicks Hole, and the distance therefrom of about the entire length of the tow, is Lone Rock, very nearly in the path of the tug if she had proceeded in a direct line from Clark's Point into the Hole. She might have passed this rock on her starboard, leaving it on the west, thus giving her a larger fairway and a more direct course into the Hole. She left it on her port—that is, on the east—which, as she made her courses, required her to change to her port on entering the Hole. Her course was so far to the westward of Lone Rock that the change which she was required to make involved a considerable sweep for herself and her tow. While

¶ 1. See Towage, vol. 45, Cent. Dig. §§ 11, 20.

it was not unusual to make these various courses, and the tug is not charged directly with fault on that account, yet, as she used her own option in reference thereto, the court is compelled to apply to her with great strictness the usual rules of diligence obligatory on a vessel of her class engaged in waters with which she is presumed to be familiar. Under the circumstances, if she had used the diligence she should have used, she would have passed her tow into the Hole with safety.

As, in passing Lone Rock, the tug swung her course to her port, this left the barges heading, or sagging down, towards the projecting rocky shoal, known as "North Rock," which marks the entrance to Quicks Hole on her starboard. The Pine Forest was wrecked; and it is claimed by the libelant that she was wrecked on what is known as the "Fourteen-Foot Spot," marking the extreme edge of this North Rock. On the other hand, the tug claims that the barge was wrecked on what is known as the "Felix Ledges," which are near the center of the channel after well entering the Hole. The Felix Ledges were not at that time shown on any chart, and had not been disclosed by any surveys of the United States. As the case stands, it can hardly be questioned that, if the barge struck there, the tug was not at fault. But, on the other hand, it can hardly be questioned, and, in fact, is apparently not questioned, that, if she struck on the "Fourteen-Foot Spot" on the North Rock, the decree of the District Court was correct so far as this particular point is concerned.

Another barge was wrecked on the Felix Ledges about the time this disaster occurred, and the two induced a survey by the United States. This disclosed two pointed rocks, or bowlders, which, according to the Coast Survey charts subsequently published and since in use, are 18 feet below the surface of the water at mean low tide. There are other rocks or bowlders between the two, or in their neighborhood; but, so far as the United States survey is concerned, none of them are so shoal as 18 feet, and, moreover, at the time of the wreck, the tide had not fully ebbed. There was an effort made by the Triton to prove that the United States charts are not correct, and that, at certain stages of the tide, there are only about 16½ feet over the Ledges. The District Court found, however, that there is so much water over them that the barge could not have impinged on them. On the whole, the evidence, including the official surveys, justifies this finding, and requires us to agree with it, and to determine that the wreck occurred at the so-called "Fourteen-Foot Spot."

Only one other proposition comes before us. It is claimed that the barge Pine Forest was in fault in not properly following the course of the tug. It is with extreme difficulty that a question of this character can be determined satisfactorily from contradictory proofs, especially when, as in the case at bar, the courts are not assisted by the opinions of well-qualified experts in reference thereto. This proposition, however, is easily disposed of on the well-known rule that in marine cases the judgment of the responsible parties exercised on the spot must ordinarily prevail. Capt. Chase of the tug testified as follows:

."Int. Do you have any signals for calling attention of the tow to their not steering properly? Ans. Yes, sir.

"Int. What are they? Ans. Several short quick whistles to pay attention.

"Int. You say you did not use those signals, or any signals, at that time? Ans. No, sir.

"Int. Why not? Ans. I supposed that the barge had plenty of room to come clear.

"Int. Then you considered that where she was was all right, did you? Ans. After we got by the point, I supposed she would come by all right. It seems, though, that she didn't."

Under the circumstances of the weather and the hour of day, there can be no question that Capt. Chase was at the time able to see and comprehend the situation perfectly. The facts stated by him, that he made no signal to the barge, and that he then supposed she had plenty of room to go clear, and that she would come by all right, make a practical verdict in reference to this proposition of the defense. It is clear that he, as master of the Triton, did not at that time charge the barge with not steering properly, and it is too late for the tug's representatives to do so now. Therefore, on both propositions, we come to the same practical conclusion as the District Court.

The decree of the District Court is affirmed, with interest, and the appellee will recover its costs of appeal.