### THE PINE FOREST.

#### (Circuit Court of Appeals, First Circuit. March 29, 1904.)

#### No. 487.

1. SALVAGE—RAISING SUNKEN VESSEL—SERVICES RENDERED BY OWNERS OF VESSEL IN FAULT.

The raising of a sunken vessel is not a salvage service for which compensation can be collected, where the sole owners of the vessels employed in the raising were also the sole owners of the one through whose fault the sinking occurred.

2. SAME.

A barge sunk while in tow of a tug was raised and brought into port by other vessels owned by the owners of the tug. Subsequently the tug was libeled for the loss, and then filed a petition for limitation of liability, which prevailed. Afterward her owners brought suit to recover for salvage services rendered in raising the barge. The tug was held solely in fault for the sinking of the barge, and the damages exceeded her stipulated value, without taking into consideration the cost of salvage, and a decree was entered for such stipulated value. *Held* that, whatever may have been the rights of the owners of the tug with respect to salvage if they had surrendered her before performing the service, the proceeding to avail themselves of the limited liability statute, not having been begun until after the service was rendered, could not affect the application of the rule that a salvage reward cannot be claimed by the owners of the vessel through whose fault the services were rendered necessary.

Appeal from the District Court of the United States for the District of Rhode Island.

For opinion below, see 119 Fed. 999.

¶ 1. See Salvage, vol. 43, Cent. Dig. § 44.

Eugene P. Carver (Edward E. Blodgett, on the brief), for appellants.
Robert M. Morse and William M. Richardson, for appellee.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. This appeal relates to a libel for salvage, following a wreck which occurred under circumstances shown in the record in The Triton, in which case we passed down an opinion and entered judgment on February 4, 1904. 129 Fed. 698. The libel in this case was dismissed by the District Court, and the libelants appealed to us. The Triton was a steam tug which had the barge Pine Forest in tow. The record stipulates into this case the proofs and proceedings in The Triton, where we found that the Pine Forest was wrecked, and that the tug, under her contract of towage, was liable for the damage arising therefrom. The amount now claimed is for raising the Pine Forest and bringing her into a port of refuge. It is agreed that we are to accept $8,750 as a fair value of the services, if they are to be recovered for in this proceeding. It was stipulated in The Triton that, aside from the $8,750 now in controversy, the damage to the Pine Forest and her cargo, for which the Triton was primarily responsible, amounted to $24,784.91. The items making up this total were stated in detail, and included repairs and refurnishings at the port of refuge, damage to the cargo, loss of freight, demurrage, loss of personal effects of the crew of the barge, and small incidental items. Therefore, if the amount now claimed is included with the stipulated damage to the barge and cargo, the total would be $33,534.91. It also appears in The Triton that her owners availed themselves of the provisions for limited liability contained in section 4283 of the Revised Statutes, and sequence; and, for that purpose, the value of their interest in accordance therewith was stipulated at $20,000. Consequently, damages were awarded at that amount, interest, and costs.

The barge was raised and brought into port, not by the Triton, but by the libelants, now the appellants, who were the owners of the Triton, or the representatives of those owners, and also the owners, or representatives of the owners, of the tugs and barges employed in the salving enterprise. Indeed, it is agreed that the libelant in The Triton is to be taken as the claimant in the case now before us, and that the libelants in the case now before us are to be taken as the claimants in the other suit and owners of the tug. The present libelants, however, undertake to make a distinction based on a claim that the employment of the Triton in the towage service for which she was held responsible was under a charter; but this is dismissed from our consideration by the fact that it appears, on cross-examination of the witness who testified that she was under charter, that it was not of the hull of the tug, and that during the towage service she remained under the control of her owners. It cannot be claimed on the proofs before us that her owners pro hac vice were other than the registered owners. Thus the legal identity of the parties in interest in the two litigations is established.

In The Glengaber, L. R. 3 A. & E. 534, 535, decided by Sir Robert Phillimore in June, 1872, a vessel was brought into a position of jeopardy by a steam tug, as in the case at bar. Another steam tug, the

Warrior, of which only a part of the owners were owners of the tug at fault, rescued the tow. It was held that the case was one of salvage. Sir Robert Phillimore concluded as follows:

"I know of no authority for the proposition that a vessel wholly unconnected with the act of mischief is disentitled to salvage rewards, simply because she belongs to the same owners as the vessel which has done the mischief."

It will be noticed that this expression ignored the fact, which was carefully stated in the report of the case, that only some of the owners of the Warrior were owners of the other tug; and the decision has been cited with apparent approval, either without reference to this distinction, or without following it out, by text-writers usually authoritative. Kennedy's Law of Civil Salvage, 74, 75; Carver's Carriage by Sea (3d Ed. 1900) 386, note e. This makes, apparently, a weighty body of authority, all resting on the proposition that we are to look at the conduct of the salving ship only, and that this identifies with her all who are connected with her, whether as officers, seamen, or owners. Nevertheless, this is certainly not now the law in England when the ownership is identical, as in the case at bar.

Authoritative English decisions later than The Glengaber, and also authoritative English text-writers, hold the rule which defeats salvage in the case before us. In The Glenfruin, 10 P. D. 103, decided in 1885, the salving vessel was expressly excluded on the ground of identical ownership with the vessel in fault; and The Cargo ex Laertes, 12 P. D. 187, 190, decided in 1887, laid down the same rule in positive terms. So in Carver's Carriage by Sea (3d Ed.) 386, at the same page where the note refers to The Glengaber, the learned author, who is accepted as high authority, adopts the rule of The Glenfruin; and the work entitled Abbott's Merchants' Shipping and Seamen (14th Ed. 1901), at page 975, says:

"The owners of a salving ship who are also the owners of the salved ship may obtain salvage remuneration from the owners of the salved cargo, provided the circumstances which caused the necessity for the salvage services do not amount to a breach of the contract of carriage between the ship's owners and the owners of the cargo which is on board the salved ship."

This is also accepted as the law in so accurate a work as Williams & Bruce, Admiralty Practice (3d Ed. 1902) 141. The Glenfruin has never been questioned in England by any text-writer, or, so far as the official reports disclose, by the Supreme Court of Judicature in any of its departments, by the Privy Council, or by the House of Lords. These authorities declare the right of the crew of the salving ship to salvage; but this, of course, avoids the difficulties of the case before us. To the same effect, The Clarita and The Clara, 23 Wall. 1, 19, 23 L. Ed. 146, referring to circumstances under which the peril to which a vessel may be exposed is caused by libelants who claim salvage reward, says that "to the rule that such libelants are not entitled to recover there are no exceptions." Therefore, in view of the fact that the parties are identical, as we have explained, the present libelants are positively barred by the authorities everywhere, unless relieved by the statutes of limited liability.

As already stated, the owners of the Triton availed themselves of those statutes, and damages were assessed against her to the full amount at which her liability was limited. Therefore her entire value was exhausted in the proceeding against her. In this connection dates become important, and they are as follows: The wreck occurred January 16th; the work of raising the Pine Forest commenced on January 18th, and was completed on February 27th; on March 5th, the Triton was libeled; and on March 10th, the application was made for a limitation of liability. In the succeeding April the present libel was filed. So it appears that all the services for which compensation is now claimed were performed prior to the application for limitation of liability. Thus the present condition is a complication of artificial results arising from a mere incidental order of succession of dates. If the owners of the Triton had appreciated that she would ultimately be found at fault by the court, they might have surrendered her before commencing the services for which compensation is now claimed, and thus, perhaps, they could have purged themselves, and entitled themselves to a salvage reward. Also, if the services now claimed for had been rendered by some one else than the owners of the Triton, the burden of them would have rested on the claimant of the Pine Forest, without any right of recoupment from the owners of the tug. As it stands, the owner of the barge is receiving $20,000, in addition to services of the value of $8,750, a total of $28,750, thus in excess of the amount at which the Triton was appraised. This is contrary to the underlying purpose of the statute of limited liability. Nevertheless, by force of the rules and authorities to which we will refer, this anomalous result cannot be avoided.

It is to be borne in mind that the claim asserted in this libel is for salvage. But according to the underlying rules of the admiralty law, and aside from the statutes of limited liability, it is clear that the services rendered by the libelants, inasmuch as they were the owners of the Triton, were not salvage services. The authorities are overwhelming that under those rules there can be no salvage reward to a vessel or individual with reference to a condition arising from the fault of that vessel or individual. This is not merely technical, but it is recognized everywhere as fundamental.

In stating this proposition, we must regard as ineffectual the suggestions on the one side and the other with reference to the nature of the alleged stipulations between the owner of the barge and the owners of the Triton, and of the conferences which occurred between them, as to the services which were rendered by the present libelants. Salvage does not ordinarily arise out of a contract, and the most formal agreements for salvage or rescue services do not bar the admiralty from reaching the merits, or from applying its fundamental rules when circumstances justify it. Presumably, at the time of these conferences, the libelants had no belief that the Triton was in fault, or that there was anything in the way of their recovering for the services which the conversations concerned, and to which the present litigation relates. Very likely, also, the owner of the Pine Forest had at that time no decided understanding otherwise. Nevertheless, as well observed by the learned judge of the District Court, this suit "must be determined.

from the proof as to the things which were done"; that is, from the event. What we intend by this, a hypothetical illustration from a class of cases which are common will make clear. Two vessels are in collision; No. 1 is seriously damaged and No. 2 only slightly injured, or not injured at all. No. 1 appeals to No. 2 for assistance; and immediately from the decks of the two vessels, the masters agree as to a round sum to be paid for the assistance, if successful. All this is effectual if it is afterwards determined that No. 2 is not in fault, but it goes for nothing if it is finally settled that she was the guilty vessel. Therefore, as we have said, the conferences referred to are not of importance on the appeal before us.

We come to the precise proposition that, at the critical time, the relations of the Triton and the Pine Forest were such that, under the maritime law, no claim could arise on which the libel now before us, which asks salvage, can be based. The Triton was under a contract of towage. She was not released from that contract by the mere fact that the barge required assistance which, under ordinary circumstances, would entitle those rendering it to salvage compensation. The Carbonero, 106 Fed. 329, 333, 45 C. C. A. 314. Also, under all the authorities and on principle, a towage contract cannot be converted under the admiralty law into a salvage service under conditions brought about by the fault of the tug, as in the case before us. This is declared in nearly all the authorities we have cited, and emphatically in The Clarita and The Clara, 23 Wall. 1, 18, 19, 23 L. Ed. 146. A very late reaffirmance of the rule is found in The Duc D'Aumale (1904) P. 560.

These propositions are not dicta, nor limited to special circumstances. They are the logical results of proportions of maritime law, so plain that they need not be detailed, and all the text-writers of authority agree to them. We have no occasion now to discuss the conditions under which officers and crews can become salvors, because there are here no such conditions. The officers and crews of the rescuing tugs and barges were paid their ordinary wages, included in the $8,750. These rules of maritime law would so plainly bar the libelants from maintaining a libel for salvage as salvage that we would not have deemed it necessary to elaborate them, or cite authorities in reference thereto, except that they do not appear to have received special attention in their particular application to the case at bar. They dispose of this case, because, as we have said, it is strictly a libel for salvage.

Nevertheless, it is interesting and worth our while, in order to avoid any impression that we are disposing of this appeal on merely technical grounds, to pursue the relations of the parties to the controversy somewhat further. Section 4283 of the Revised Statutes [U. S. Comp. St. 1901, p. 2943] provides that the "liability of the owner" "shall in no case exceed the amount or value of the interest of such vessel and her freight then pending." If we had only that general declaration of the fundamental rule of adjustment, and the case was not merely a libel for salvage, but one which would enable us to make a complete disposition of all counterclaims and all equities pro and con, we might, perhaps, in the absence of authorities otherwise, administer the statute by holding that the owners of the Triton, in rendering services, in raising the Pine Forest, to the value of $8,750, should be equitably dis-

charged from liability to that extent, and that, in determining all the sums to be awarded against her and her owners, this $8,750 should be deducted; so that ultimately the statutory provision that the liability of owners should in no case exceed the amount or value of their interest could be literally, and also substantially, complied with. But, aside from the fact that the form of proceedings now before us could not, for the reasons we have stated, permit so broad an adjustment, the various statutes of limited liability have not been administered practically in that enlarged manner, and do not contain machinery adjusted thereto.

As sustaining this proposition, the claimant relies on The Benefactor, 103 U. S. 239, 245, 26 L. Ed. 351, where it is said that, in case of payment of a demand against a vessel before proceedings for limited liability are commenced, the court will refuse its aid in compelling return of the money received. This, however, is to be considered in connection with the later case of The City of Norwich, 118 U. S. 468, 6 Sup. Ct. 1150, 30 L. Ed. 134. What is to be met in the case at bar is not a simple proposition like that in The Benefactor, but the possibly logical result of the application of the statutes of limited liability in harmony with The City of Norwich, at page 493, 118 U. S., 6 Sup. Ct. 1150, 30 L. Ed. 134. Speaking of the options given the vessel owner, namely, one of surrendering the vessel and the other of an appraisal, this opinion says that the measure of liability is the same whichever course is adopted. It adds that this "enables the owner to lay out money in recovering and repairing the ship, without increasing the burden to which he is subjected." This has reference to repairs which might be made on the ship in fault before proceedings for limited liability are commenced; and, on broad principles, the owner of the offending vessel ought to be allowed, in the same way, to recover and repair the injured ship without increasing his burden. In other words, in order that the liability of the owner of an offending vessel may not exceed his interest, the rule has been settled by the Supreme Court that the value thereof shall be taken as of immediately after the damage was done; and the point is to meet the proposition that, to give full effect to the logical sequence of that rule, everything else should have relation to that point of time. In other words, the proposition to be met is that, when the application for a limitation of liability had been made by the owners of the Triton, she and they were purged as of the time immediately after the Pine Forest was wrecked.

There is another difficulty which meets the claimant in this case. Under all circumstances, according to the rules of maritime law, no one should be discouraged from rendering assistance to a vessel in distress. Sometimes, as we may well presume to have been the fact in the case at bar, the owners of the offending vessel, by their equipment and adjacency to the place of wreck, are the most competent of all to effect a prompt rescue; but, on the rule asserted by the claimant, and which, by the force of authority, we are compelled to accept, such persons. when situated like the libelants, may well say: "We refuse to expend our moneys in behalf of your property until we have applied for the benefit of the statutes of limited liability, so as to enable us to recover what we may disburse." Such a proposition would not be admissible

129 F.—45

where life was involved; but, when it is a mere question of property, there is no unreasonableness in the interests of one party being balanced against those of another.

Notwithstanding these difficulties, we seem, as we have said, to be bound by authority to affirm the decision of the District Court dismissing the libel. Under the English statutes, the point seems to have been directly determined against the owners of the Triton. The Ettrick, 6 P. D. 127, was first decided by Sir Robert Phillimore, and he was affirmed on appeal, at page 132, all in 1881. The case is accepted by so careful an authority as Mr. Marsden in his Collisions at Sea (4th Ed.) 193, which gives the pith of this decision. That under the English statutes, the liability extends to eight pounds per ton of the offending vessel is not essential, as is plain of itself, and as is also emphasized by the fact of the citation of The Ettrick by the Supreme Court, to which we will hereafter refer. The substance of this decision is stated by Marsden as follows:

"The owner of a ship sunk by collision, who, admitting that the collision was caused by the fault of his own ship, obtains judgment for limitation of his liability, and pays into court the statutory amount of his liability, does not thereby escape from the legal consequences of his wrongful act in causing the collision, except so far as the act expressly relieves him. The owner of a ship sunk in the Thames paid into court the statutory amount of his liability. His ship was raised by the Thames Conservators (who have statutory power to raise wrecks and reimburse themselves for the expense of raising them by sale of ship and cargo), he undertaking to pay the cost of raising. It was held that the shipowner was bound to hand over cargo on board to its owner, and that the cargo owner was not able to pay him anything by way of salvage or general average contribution."

In the case as reported, Jessel, the Master of the Rolls, at page 132, states the position of the owner of the offending vessel in such a way as to present the precise difficulty we have suggested. He observes:

"He [that is, the shipowner] says that the payment of the £8 per ton not only prevents his being answerable in damages for any more, but is equivalent to saying that he shall be in exactly the same position as if no negligence had been committed."

That is to say, the Master of the Rolls puts the position of the shipowner as though he had claimed that a compliance with the statutes of limited liability purged his vessel and himself as of the time when the damage was done. Of course, The Ettrick necessarily overrules this proposition, and thus meets all suggestions in the way of the owner of the Pine Forest. There were other propositions considered in the various opinions delivered in the case, but none of them contravene the use we make of the decision. The Ettrick has never been questioned by any judicial tribunal in England. It is accepted by Mr. Justice Kennedy in his work on Civil Salvage, to which we have already referred, at page 183. It is also accepted by the Supreme Court in The Irrawaddy, 171 U. S. 187, 195, 18 Sup. Ct. 831, 43 L. Ed. 130.

The Irrawaddy supports the conclusion we are compelled to announce. That case arose under the "Harter Act," so called; but that, for all the purposes to which we apply The Irrawaddy, there is no distinction between that statute and the statutes on which the Triton relies, is true, and is emphasized by the fact that the Supreme Court used The Ettrick as we have already said. It is true that the issue in The Irra-

waddy was not one of salvage, but of general average, the shipowner claiming to share therein, although the sacrifice which underlay it was made in order to relieve against the fault of his own vessel. General average and salvage, for all the purposes we are considering, are to be spoken of in the same breath; and, indeed, they run together in a great many respects. The pith of what applies to this case is stated at pages 193, 194, 171 U. S., and page 833, 18 Sup. Ct., 43 L. Ed. 130, as follows:

"The act in question [meaning the Harter act] does undoubtedly modify the public policy as previously declared by the courts; but if Congress had intended to grant the further privilege now contended for, it would have expressed such an intention in unmistakable terms. It is one·thing to exonerate the ship and its owner from liability for the negligence of those who manage the vessel; it is another thing to authorize the shipowner to do what he could not do before, namely, share in the general average occasioned by the mismanagement of the master and crew."

This, in connection with the citation of The Ettrick, is a declaration that the rules of interpretation as applied in The Ettrick and The Irrawaddy run on parallel lines, and reach in the same way the statutes of limited liability on which the Triton relies as they do the Harter act. The result is that, on the fundamental principles of the maritime law, neither the Triton nor her owners can recover for salvage services to the Pine Forest, and, on the authorities, there is nothing in the statutes which gives them relief in this respect beyond what otherwise existed.

There is much force in the proposition that the statutes of limited liability on which the Triton relies effectuate a privilege, so that, if availed of by a vessel owner, it must be taken with all the burdens of the condition as it exists at the time to which the acceptance has been delayed; in other words, that, unless the shipowner acts at once and promptly, he must stand the consequences thereof. Under some circumstances it would be impossible to escape this proposition in some respects. The opinions of the Master of the Rolls and the Lords Justices in The Ettrick contain several expressions in that direction; especially the former at the foot of page 132, and Lord Justice Brett at page 134, where he speaks of "a new series of events," meaning the raising of the Ettrick and her cargo, "with which, to my mind, the act of Parliament," meaning the statute limiting liability, "has nothing whatever to do." Nevertheless, in view of the various considerations which we have stated, it is not safe to apply this proposition too rigidly or universally. Possibly the circumstances would admit of its application here; but we deem it safer to dispose of this appeal in view of the authorities which we have cited, and which, taken together, result in the proposition that, whatever may be the theory of the statutes, they contain no suitable provision or machinery for working out any salvage compensation for the libelants, now the appellants.

With reference to any services which might be rendered after an application for limited liability has been made by the owners of an offending vessel, the position would probably be different; but, as this case stands, we are led to the conclusion that the libelants can obtain no relief.

The decree of the District Court is affirmed, and the appellee recovers its costs of appeal.